Jeanine Santiago
92639-022
Federal Correctional Institution
5701 8th Street
Dublin, CA. 94568



E-filing

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Jeanine Santiago,<br>Plaintiff<br><br>v.<br><br>Federal Bureau of Prisons,<br>Harley Lappin, Sheila Clark,<br>Paul Copenhaver, Teresa Butts,<br>Michael Goldstein,<br>T'Rhosia Blassingame, Belen Ezaz<br>Peggy Boynton, Sheryl Andersen,<br>B. Hernandez Mlp, J.Rich RN,<br>In their individual and official<br>capacity,        Defendants | CASE NO.<br>CV 08          3837<br><br>COMPLAINT<br>A CIVIL ACTION<br>PURSUANT TO<br><br>42 U.S.C. §1983<br>Bivens v. Six Unknown Agents<br>403 U.S. 388 (1971)<br>28 U.S.C. §2671 |

**COMES NOW,** Plaintiff, Jeanine Santiago, Pro Se and filing motion

for leave to proceed in forma pauperis, before this honorable court.

### I. JURISDICTION & VENUE

1.    This honorable court has competent jurisdiction under 28 U.S.C.

§1391(e) and 28 U.S.C. §1343 (a)(3).  Plaintiff seeks declaratory

relief pursuant to 28 U.S.C. §2201 and §2202.  Plaintiff's claims for

injuctive relief are authorized by 28 U.S.C. §2283 and §2284 and Rule 65

of the Federal Rules of Civil Procedure.  Damages are authorized by

28 U.S.C. §1346(b)(1)(2). Also under 28 U.S.C. §1331.

(1)

2.     The Northern District of California, United States District
Court is an appropriate venue under 28 U.S.C. §1391(b)(2) because it
is where the events giving rise to this complaint occurred.

## II. PLAINTIFFS

3.     Plaintiff, Jeanine Santiago, is and was at all times mentioned
herein, a prisoner of the Federal Correctional Institution for Women
at Dublin (hereinafter referred to as Dublin FCI), California in the
custody of the Federal Bureau of Prisons.  Plaintiff is currently
confined at the Dublin FCI, in Dublin, California.

## III. DEFENDANTS

4.     Defendant, Federal Bureau of Prisons, Central Office, 320 First
Street N.W. Washinton, D.C. 20534.  Is legally responsible for overall
operations of  the institutions under its jurisdiction and its employees.
5.     Defendant, Harley Lappin, Central Office, 320 First Street N.W.
Washington, D.C. 20534, is the director of the Bureau of Prisons.
He is legally responsible for the overall operation of the Bureau
of Prisons and each institution under its jurisdiction, including
the Dublin FCI.
6.     Defendant, Sheila Clark, 5701 8th Street, Dublin, CA. 94568, was
the Warden of the Dublin FCI at the time of the incidents brought forth
in this complaint.  She was legally responsible for the operation of
the DUblin FCI and for the welfare of its inmates.
7.     Defendant, Paul Copenhaver, 5701 8th Street, Dublin CA. 94568,
is the current Warden and replaced Sheila Clark at the Dublin FCI.

He is responsible for the operations of the Dublin FCI and for the welfare of its inmates.

8.    Defendant, Teresa Butts, 5701 8th Street, Dublin, CA. 94568, was the Assistant Warden at the time of the incidents brought forth in this compaint.  She was legally responsible for the compound operation and for the welfare of its inmates.

9.    Defendant, Michael Goldstein, 5701 8th Street, Dublin, CA. 94568, is a Correctional Officer at the Dublin FCI who, at all times mentioned in this complaint, held the rank of Safety Manager and was assigned to the Dublin FCI.

10.    Defendant, T'Rhosia Blassingame, 5701 8th Street, Dublin,CA. 94568, is a Correctional Officer at the Dublin FCI who, at all times mentioned in this complaint, held the rank of Safety Specialist, and was assigned to the Dublin FCI.

11.    Defendant, Belen Ezaz, 5701 8th Street, Dublin, CA. 94568 is a doctor at the Dublin FCI who, at all times mentioned in this complaint held the rank of Clinical Director and was assigned to Health Services department and is responsible for the health and welfare of the inmates at the Dublin FCI.

12.    Defendant, Peggy Boynton, 5701 8th Street, Dublin, CA. 94568 is an Correctional Officer at the Dublin FCI who, at alltimes mentioned in this complaint, held the rank of Unit Manager and was assigned to the A/B Unit at the Dublin FCI.

13.    Defendant, Sheryl Andersen, 5701 8th Street, Dublin, CA. 94568, is a Correctional Officer at the Dublin FCI who, at all times mentioned in this complaint, held the rank of Counselor for the B Unit at the Dublin FCI.

**(3)**

14.    Defendant, B. Hernandez MLP, is an officer at the Dublin FCI who,
at all times mentioned in this complaint, held the rank of Midlevel
Licensed Practitioner at the Health Services unit in the Dublin FCI.

15.    Defendant, J. Rich R.N., is an officer at the Dublin FCI who,
at all times mentioned in this complaint, held the rank of Registered
Nurse at the Health Services unit of the Dublin FCI.


## IV. FACTS

16.    On October 26, 2006 plaintiff was injured when upon returning
from work at 11:00p.m., bent down in front of her locker and when she
stood up, sustained a scalp laceration from a screw protruding from a
makeshift step attached to the bunk bed (See exhibit A, illustration).
Plaintiff immediately reported to the Unit Officer Fernandez, as she
was bleeding profusely.  Officer Fernandez sent her to the Lieutenants
office to report waht had happened and to see the duty nurse.  Plaintiff
was instructed by Lt. Hopkins and another Lieutenant(name unknown) to
report to sick call the next day.

17.    Plaintiff reported to sick call on October 27. 2006.  Plaintiff
explained to Health Service staff member Hernandez what had happened and
that she was instructed to report to scik call by the Lieutenants the
night before.  Hernandez did not check laceration or examine plaintiff,
but gave her an idle from work because plaintiff complained of a headache.

18.    On November 6, 2006 plaintiff wrote a "cop out" (inmate request
to staff) to CMS (Central Maintenance Services) and asked to have the
screw removed (see cop out attached to BP-9 regarding Safety Department)
because it was a hazard and both plaintiff and her roommate M. Quindo

(4)

had sustained injuries from the hazard.

19.    On December 3, 2006 upon being awakened for the 10:00a.m. stand up count, plaintiff sustained a serious injury to her neck when she climbed down from the top bunk, using the makeshift step, became dizzy, fell and was impaled by the protruding screw. When plaintiff fell, the screw caught her neck and her neck was twisted. Plaintiffs roommates helped her up and yelled for help. Plaintiff saw the gaping hole in her neck in the mirror and thought she was going to die. Officers Cardinas and Lao responded and called for medical to respond to the unit. Medical did not respond to the unit and plaintiff sat on the steps in shock with blood soaking a towel and waited while the officers finished counting. Plaintiff walked herself, dizzy and in shock over to Health Services across the compound with the aid of Officer Cardinas.

20.    Plaintiff was subsequently taken to Valley Medical Center. When Officer Cardinas asked Ms. Rich why she had not responded to the unit, she complacently indicated that she "thought it could wait until after count." At Valley Medical Center plaintiff was seen by Dr. Cynthia Penn-Duecker, M.D. who said she had come within a centimeter of losing her life, as the laceration was that close to her coratid artery and jugular vein. Dr. Penn-Duecker gave plaintiff 16 stiches and diagnosed her with a complicated laceration, whiplash and prescribed a neck brace and pain medication, hydrocodone. X-rays later revealed a reversal of the lordorsis and soft tissue injury. (See exhibit B, diagnosis and x-ray results from Valley Medical Center)

21.    Plaintiff returned to Dublin FCI the same evening. When she was seen by J. Rich R.N. at the Health Services Unit that evening, Rich

removed the neck brace and refused plaintiff pain medication prescribed
by the Doctor who treated plaintiffs injuries.  Plaintiff was not given
any pain medication until the following day at 2:30p.m. when her precriptio
was replaced by Dr. Belen Ezaz, with Motrin. (See exhibit C prescription
written by attending physician)

22.    Plaintiff was told to report to Dr. Ezaz the following morning
at 8:30a.m.  When plaintiff arrived to Health Services, tired and in pain,
she waited for over an hour until 10:00a.m. and when Dr. Ezaz finally
came to speak with her, she told her to report back to Health Services
at 1:30p.m. (this time is when sick call is scheduled everyday).  Plaintiff
complained that she was in alot of pain to which Dr. Ezaz waved her hand
as if to "shoo" plaintiff away and ignored plaintiffs request for pain
medication.  When plaintiff reported back to Health Services at 1:30p.m.
Dr Ezaz again refused plaintiff pain medication as prescribed and refused
to listen to anything plaintiff had to say with regard to what she was
feeling or the level of pain she was experiencing.  Ezaz did not examine
plaintiff of check plaintiffs stiches.

23.    At 6:30a.m. on December 6, 2006, plaintiff was awakened by
Assistant Warden Butts.  Ms. Butts asked plaintiff what had happened
because she was informed by another inmate, Becky Hunter, about the
incident.  Plaintiff explained what happened and informed Ms. Butts that
it was not the first injurt she had sustained from the hazardous screw
and that plaintiff had made an inmate to staff request regarding the
screw the prior month.  At approximately 7:30 a.m. someone from the
facility deapartment came and cut the screw off the step.  At approximately
8:30a.m. plaintiff was called over the loudspeaker in the unit.  Plaintiff

reported to the unit Counselor Andersens office and was rudely greeted by Unit Manager P. Boynton.  Ms. Andersen expressed that they had just found out from Ms. Butts about the accident.  Ms. Boynton interrupted her and said to plaintiff "what I want to know from a unit managers prospective is, who did you tell?"  Plaintiff did not understand the question and expressed such to Ms. Boynton.  Ms. Boynton became frustrated and brushed passed plaintiff, bumping in to her on the way out of the door.  Ms. Andersen said that plaintiff was "supposed to inform Unit Team about these things" and then dismissed plaintiff from her office when plaintiff asserted that she was not aware that it was her responsibility to inform Unit Team, but that she did submit a cop out to Central Maintenance Services the month prior.

24.    On December 6, 2006 plaintiff went to Central Maintenance Services to obtain a copy of the Safety report regarding the incident and was informed by T'Rhosia Blassingame that there was no such report for either injury she had sustained from the hazardous screw.  When plaintiff informed him that there were multiple hazards such as the one she was injured on, in the unit, Blassingame responded that the hazards throughout the compound  had been abated and a room by room inspection done.  He also informed plaintiff that they had "inmates willing to sign sworn statements that she was doing yoag at the time of her accident."  Plaintiff informed him that that was impossible since the incident occurred during the 10:00a.m. stand up count.

25.    At lunch time Ms. Butts requested inmate Becky Hunter (See exhibit D, statement of Becky Hunter)to tell Ms. Santiago to come to "mainline" lunck to see her.  When plaintiff reported to Ms. Butts she asked plaintiff

if she was doing yoga at the time of the incident and said that several
inmates had seen plaintiff doing yoga before her accident.  Plaintiff
informed Ms. Butts that it was impossible for that to be true because
it happened during the 10:00a.m. stand up count and in order for inmates
to have seen plaintiff "doing yoga" they would have had to be "out of
bounds" during count, which is a serious rule infraction.  Ms. Butts
became disturbed abd put her finger in plaintiffs face and threatened
to put her "in suicide watch" if she found out that plaintiff was donig
yoga at the time of her incident.  Plaintiff laughed nervously because
she was afraid and intimidated.  Ms. Butts asked plaintiff if she was
laughing at her to which plaintiff responded "are you threatening me."
Ms. Butts also asked plaintiff about the injury she sustained to her
scalp and plaintiff explained what happened on the noght of October
26, 2006.(See exhibit E Journal Entry for 12/07/06)

26.     Plaintiff spent the next few days trying to rest and in extreme
pain, with headaches and shooting pains down her arm and numbness in
her hand.  Plaintiff was refused a memo for a lower bunk and was afraid
of sleeping on the top bunk, which disturbed her rest and recouperation.
Plaintiff had nightmares of falling off the bed and gashing her neck open.
Plaintiff went to mainline lunch to speak to Dr. Ezaz who told her there
was nothing she could do for her.

27.     On December 10, 2006 plaintiff received two statements from her
roommates, Mary J. Quindo and Monica Lopez and a neighbor Teresa Velasquez
because of the harassment by staff about her supposedly doing yoga.  No
staff member had bothered to question these individuals, who were the
only direct witnesses to the incident.(See exhibits F,G,H inmate witnesses
written statements.

29.    On December 12, 2006 another inmate Ophelia Johnson, was injured from a screw protruding from the makeshift step attached to her bunk bed. Ms. Johnson required eight stiches in her knee.  Ms. Johnson showed plaintiff her wound which was poorly stiched by Health Services staff and was opening up between the stiches.  Ms. Johnson indicated that it "kept busting open and bleeding."  Plaintiff was appalled at what she saw and went that day to request a BP8.5 from Counselor Andersen (informal resolution - grievance).  Counselor Andersen asked what the BP8.5 was for and when plaintiff explained that she was disturbed that there were still hazards throughout the units and that she wanted to grieve the Safety Department, Ms. Andersen refused her the form and told her that it was too late to file a grievance because she only had five days in which to file Administrative Remedies.  Plaintiff did not know what the policy regarding Administrative Remedies was at this time and relied on Ms. Andersens assertion.  Upon speaking to another inmate, plaintiff was informed the she in fact had twenty days in which to file a BP-9 and that the BP8.5 was just an informal resolution process and that Ms. Andersen was supposed to attempt to informally resolve the problem and if she could not, then she was to issue the BP-9.  Plaintiff went to another Counselor. Mr. Blake, in A Unit and aquired two BP8.5's and two BP-9's.

30.    Plaintiffs stiches were removed on December 14, 2006.  When she complained to PA Seli thats he was still experiencing pain in her neck and lack of stability, including the vertebrae moving, he said for her to go to sick call and extended her idle (excuse from work) for one day and then dismissed her from the room.

31.    When plaintiff returned the next day to have her dressing changed
PA Johnson said that she could not see her because she had "too many
physicals to do", yet when she called the names on her list no on
responded.  She eventually saw plaintiff and had plaintiff removed her own
bandage and put antibiotic ointment on the wound.  Plaintiff tried to convey
to Johnson that she was still experiencing pain and lack of stability
in her neck.  Ms. Johnson refused to extend her plaintiffs idle from
work and told her to report to sick call the next day.

32.    Plaintiff was forced to return to work at the Call Center,
where she is a information operator, on December 17, 2006 but was sent home
by her supervisor because she could not adequately perfom her duties.
Plaintiffs supervisor directed her to report to sick call the next day
and get an idle.

33.    Plaintiff returned to sick call on December 18, 2006 and PA Seli
informed plaintiff that she "had severe trauma to her neck and would be
in pain for the rest of her life" he also said that if plaintiff could
not handle her job at the Call centter,she should quit.  Plaintiff was
given an appointment to see Ms. Hernandez MLP the following morning at
9:30a.m.

34.    Plaintiff attempted to submit two BP-8.5's to Counselor Andersen
on December 18, 2006.  Ms Andersen refused to accept the grievance forms
as "untimely".  The form were not untimely and by policy Andersen was supposed
to attempt to informally resolve the grievances or provide plaintiff with
two BP-9's for formal resolution.  Plaintiff had to, again go to Counselor
Blake in A Unit to obtain Administrative remedy forms (See COunselor
Blakes initials at top of all Administraive remedy forms).  Counselor
Blake asked plaintiff why she kept coming to him when she lived in Bunit.

and plaintiff explained that Ms. Andersen was refusing to receive or provide forms to plaintiff under the premise that it was too late to file a regarding the incident.

35.    Plaintiff was refused pictures taken a recreation because plaintiffs scar was showing in the pictures. Mr. Hill indicated that he "could not let those go because they were obviously taken for evidence."

36.    On December 19, 2006 plaintiff returned to Health Services for her appointment with Ms. Hernandez. Ms. Hernandez had no knowledge of plaintiffs accident even though she is plaintiffs primary care provider. Hernandez told plaintiff that what she was feeling was residual from her fall and that she was "depressed cause it was CHristmas time. Plaintiff is Jewish and does not celebrate Chrismats, so this comment was highly inappropriate not to mention unprofessional. Hernandez did not listen to any of plaintiffs complaints about the problems she was having with the pain and instability in her neck but wrote her and idle for the day.

37.    Plaintiff went room by room and checked units A and B for existing hazardous screws and found twenty-one rooms with screw at least 1/2 inch or more protruding from the makeshift bunk step. Several inmates informed plaintiff that they or someone they knew had been injured because of the protruding screw. Mr. Blassingame was acting officer in the unit that afternoon and came to plaintiffs room and asked how she was doing. Plaintiff informed him that she was still in alot of pain and that there were still alot of hazardous screws left allover the unit. He noticed that the clothes rack in plaintiffs room was particularly higher than in most other rooms and he commented that it was "neat" that it was so much higher than in the other rooms. Plaintiff said that it was not "neat"

for short people  and that they had to stand on their toilet to reach
their clothes, to which he replied "I'll pretend I didn't hear that."

38.    Plaintiff submitted two BP-9's one for Safety Violations and one
for Medicals deliberate indiffernce to her medical needs.(See Administrative
Remedies)  These were submitted timely as they were within 20 days of
the incident described in the grievance. At this point Andersen refused
to return signed BP8.5's so that plaintiff could attach them to the BP-9's
for proper submission. Andersen said that it was not  her job and to
talk to the unit manager.  Plaintiff tried to ask Unit MAnager, Peggy
Boynton, about the BP8.5's and she said she "didn't know anything about
them." Plaintiff was forced to attach her copies to the grievance.
Plaintiff's BP-9 regarding Safety conditions specifically stated all
the rooms which still had existing hazard, by room numbers.  Plaintiff was
disturbed and frightened for anyone else to be injured.

39.    On December 23, 2006 yet another inmate was injured  on the
hazardous screw protruding from the makeshift bunk step.(See exhibit I
statement of Elvia Valencia)  Ms. Valencia filed Administrative Remedy
regarding the incident.  Ophelia Johnson indicated to plaintiff that
she was "afraid" to file a grievance because she was leaving soon and did
not want to have any trouble with her release date.  Ms. Johnson showed
plaintiff her injury, her stiches had been removed too soon and the
laceration was reopening and oozing fluid.

40.    On December 26, 2006 plaintiff awakened stiif and sore and unable
to move her neck without it cracking.  Plaintiffs muscles were spasming
and it was difficult for her to stand for long without beccomming dizzy.
Plaintiff went to "sick call" as this is the only way to get medical

attention.  Plaintiff was given  an appointment for December 28, 2006.
Plaintiff was refused an idle and was forced to go to work suffering
from extreme pain in her neck.  Plaintiffs supervisor at the Call Center,
Ms. Ingham, asked plaintiff why medical would not give her an idle and
told her to go back to the unit since she was unable to perform her
job adequately.

41.     On December 28, 2006 plaintiff returned to Health Services at
9:30 a.m. and was givenan idle fro the day.  Ms. Hernandez told plaintiff
to return to sick call, again, if she wanted to extend the idle.  Plaintiff
was getting frustrated about having to come back everyday to sick call to
get an idle, and not being treated or even listened to regarding what
physical problems she was having, including the continued dizziness and
instability in her neck with the muscle spasms.  All that Ms. Hernandez would
say is that "you need muscle relaxers" and when plaintiff replied that that
would be some kind of relief Hernandez informed her "we don't have any."
Plaintiff was instructed to return to sick call again on Friday to get
an appointment to see Dr. Ezaz.  Plaintiff inquired as to why she could
not be given the appointment while she was there and Hernandez responded
that she had "to return to extend the idle."  This left plaintiff
frustrated over getting the run around, causing additional pain and
discomfort and prevented plaintiff from getting the rest and recouperation
which she needed most at this point.

42.     On December 29, 2006 plaintiff returned to sick call, again,
Ms. Hernandez did not speak to plaintiff and made her another appointment
to see her (Hernandez) again, and refused to extend plaintiffs idle.
When the othe PA(name unknown) indicated that Hernandez was issuing the

appointment on their physical day, Ms. Hernandez told her to "shhh".
Plaintiff asked Hernandez about the X-rays that had been done at the
hospital and at Health Services and HErnandez said there was "nothing
in her chart about X-rays." Plaintiff thought it was interesting that
Hernandez could say that without plaintiffs chart there in front of her.
Plaintiff still had not received an appointment to see Dr. Ezaz. When
plaintiff informed Hernandez that she needed pain medication, Hernandez
ignored her. Plaintiff was dismissed and told to come back on Wednesday,
even though there was no sick call on Wednesday. Plaintiff was repeatedly
unable to communicate with Health Services staff and given the run around
for weeks after her accident impairing her healing process and causing
additional pain and suffering.

43.     On December 31, 2006 plaintiff returned to sick call and spoke
again, with Ms. Hernandez about her work schedule and the fact that the
250mg of Naproxen was not alleviating her pain and in fact it was getting
worse. Ms. Hernandez indicated to plaintiff that they could not reduce her
work hours to part time as they have done for others with spinal problems.
Plaintiff was instructed by her work supervisors Mrs. Bernhardt and Ms.
Elvin to have Health Services reduce her work schedule to part time.
Health Services refused even though plaintiff indicated that she was
having difficulty performing her job and that the stress of the job was
adding to and causing more pain and suffering. Plaintiff complained of
severe pain in the area where her skull meets her neck and continued
lack of stability, pain running down her arm and numbness in her fingers.

44.     On January 1, 2007 plaintiff experienced another dizzying blackout
when she tried to self massage her neck and shoulders, as instructed to do
by Hernandez. When plaintiff went to work she had to be taken off the

phone because of dizzying pain shooting into her skull and down her arm.
Her supervisor suggested that plaintiff get a job in the unit where the
work is less demanding.  Plaintiff did request a job in the unit on more
that one occasion, with Counselor Andersen.  Plaintiff was told there were
"no positions available, "I cannot take Mr. Kidd's people", and finally
"we just don't want you in the unit."

45.    On January 2, 2007 plaintiff was awakened by a call for her to
report to the officer's station.  Ms. Bernadini was investigating
plaintiff's BP-9's regarding Safety and Medical.  She looked at plaintiff's
bunk and asked how plaintiff fell on to the screw.  Ms. Bernadini said
to plaintiff  "you do not want to informally resolve this do you?"
Plaintiff indicated that she was upset about the other people who had been
injured and Health Services refusal to aknowledge or treat plaintiff and
the run around that she was getting from Health Services trying to get
treatment.  Plaintiff spoke to Ms. Bernadini about the list of rooms she
submitted that still had the hazard.  The unit officer came by the room
and informed Ms. Bernadini that she was being paged and she left.  Plaintiff
submitted another cop out to Ms. Andersen requesting receipts for the
two BP-9's she submitted.

46.    On January 3, 2007 plaintiff returned to Health Services for her
appointment with Ms. Hernandez.  Plaintiff was supposed to see Dr. Ezaz
and when Ms. Hernandez entered the lobby, she waved her hand at plaintiff
and said to her "tomorrow, tomorrow" and then went back into the hall.
She did not reappear to reschedule plaintiff's appointment.  Plaintiff
sat in the lobby for one and a half hours.  When plaintiff returned to
the unit she was informed that she was being paged by the unit officer.

Upon reporting to the unit officer, plaintiff was informed that Mr.
Goldstein, the Safety Manager, wanted to speak with her. That afternoon
plainitff went to "mainline" (lunchtime in the dinig room when inmates
can speak to staff and heads of departments) to speak to Dr.Ezaz about
her inability to get an appointment to see her. When plaintiff entered
the building she was approached by Lieutenant Wolfe, who asked plaintiff
how she was feeling. Plaintiff explained to the Lieutenant that she was
 in alot of pain and that Health Services was giving her the run around.
He asked her if she was "keeping a written record" and plaintiff indiccated
that she was in fact writing everything down in her journal. Then
another man plaintiff did not recognize asked her her name and on his jacket
it said Goldstein. Mr. Goldstein invited plaintiff outside "where it is
quiet", to speak with him and Ms. Bernadini. He said to plaintiff that
he had "just found out" about her accident from her BP-9 and he wanted
to informally resolve it. He said that he was informed that all screws
had been removed and plaintiff informed him that in fact as of that day
the screws listed on the BP-9 had not been removed and that two other
women had been injured, to add to all the ones injured previously. He
instructed plaintiff to "have those women come and speak to me." He
did not address the fact that the hazard still existed all over the
compound and indicated that plaintiffs request for remedy, that the
units be inspected by an outside source, OSHA, for safety violations,
would be denied. He told plaintiff to drop her BP-9 and that he would
provide her with a Tort claim form. He also said that he was "the one
who writes the report to the claim adjuster." He also stated that he
couldn't "guarantee how much you'll get" but that he would confirm that
plainitff "had been injured in the unit on a hazard in the room" and that

**(16)**

"the worse that could happen is that they will say no to your tort."
He asked plaintiff agin to drop her BP-9. Plaintiff said to Mr. Goldstein
and Ms. Bernadini that she would not make that kind of decision immediately.
Plaintiff requested a copy of the injury report made to Safety from Health
Services, and Mr.Goldstein stated that there is in fact "a report done
to Safety even when injuries are not work related", though he never gave
plaintiff a copy of the report.  This is opposite the statement made by
Safety Specialist, Mr. Blassingame on the cop out dated December 6,2006.
(See BP-9 regarding Safety)  Mr. Goldstein indicated that plaintiff
should obtain a Tort claim from her counselor, and plaintiff laughed
at that since she was having difficulty in obtaining anything from
Ms. Andersen.  He said  that she should come by his office and that he
would provide her with a Tort claim form and that she should see Ms.
Bernadini about dropping her BP-9.  Plaintiff asked Ms. Bernadini how
she would go about contacting her, and Ms. Bernadini indicated that
plaintiff could have the unit officer callher and she would respond to the
unit.  Plaintiff spoke to both of them about her concerns regarding the poor
medical treatment, or lack of, that she was receiving and about the BP-9
regarding medical that they had not yet addressed.  Mr. Goldstein instructed
plaintiff to come back into the dining room with him.  He told plaintiff
to wait by the table and went to speak to Dr. Ezaz alone.  He called
plaintiff over to speak with himself and Dr. Ezaz.  Dr. Ezaz was irrate
and yelled at plaintiff that she "needed to go to sick call." Plaintiff
told her that she had been to sick call six or more times and seen Ms.
Hernandez 2 or 3 times and that she had an appointment today and was told
again, to come back another time.  Plaintiff told Dr. Ezaz that she had
been getting the run around all month from Hernandez.  Dr.Ezaz said she

would look at plaintiffs X-rays but said nothing about seeing plaintiff.
Plaintiff felt nothing had been resolved withregards to either BP-9 that she
submitted.   Plaintiff felt that she was being manipulated into dropping
her Administrative Remedy and ill advised by Mr. Goldstein who was only
concerned with plaintiff dropping the BP-9 process, and not with the safety
of the compound.   Plaintiff returned to the unit immediately to log in her
journal the conversaticn with Goldstein and Bernadini. (See exhibit J
Journal entry for 1/3/07)

47.    On January 4, 2007 plaintiff returned to Health Services at
9;30a.m. and waited until 11:00a.m.  When Ms. Hernandez called plainitff
into the exam room she asked, "what is going on with you now?"   When
plaintiff tried to explain to Hernandez what she was experiencing,
Hernandez cut her off and told her that Dr. Ezaz had "ordered X-rays of
your cervical spine."   Plaintiff informed her thatshe had already had
X-rays taken at the hospital and at Health Services.   Ms Hernandez said
"they didn't have them."   When plaintiff told Hernandez that she was supposed
to see Dr. Ezaz and that this was the 6th time plaintiff had been there
to see the doctor, Hernandez said that she was just "ordered to do the
X-rays."   Plaintiff then insisted on seeing Dr.Ezaz and Hernandez took
her back to Ezaz's office, said something to her in their Philipino
language and then said "this is the Santiago woman."   Dr. Ezaz said that
she had ordered X-rays and plaintiff informed her that she had already
taken X-rays at the hospital and at Health Services.   Dr. Ezaz asked
plaintiff "why don't we have them here?"(indicating plaintiffs chart).
Plaintiff said she had no way of knowing why the X-rays were not in the
chart and tried to explain to Ezaz what she had been feeling, the cracking
and moving of the vertebrae in her neck, pain down her arm and numbness

in her fingers, also the constant pain and muscle spasms. Dr. Ezaz kept insisting to Plaintiff "nothing is wrong with you." When plainitff tried to explain how she had twisted her neck when she was impaled on the screw, Dr. Ezaz insisted that plaintiff "did not have a screw in her neck." Plaintiff was confused by this response but Ezaz and Hernandez kept emphatically insisting "there is no screw in your neck." Both Ezaz and Hernandez were yelling at plaintiff and plaintiff felt verbally abused. Plaintiff asked them both if they understood english because neither women responded to anything plaintiff said appropriately and again tried to explain what she was attempting to relate to them with regard to her symptons. Plaintiff requested that Ezaz place her on  part time work schedule as instructed by her supervisor, Ms. Elvin and Mrs. Bernhardt. Ezaz said "we don't do that" even though they do and medical is the only way to get work restrictions and several inmates at the Call center were on part time schedules as per medical for spinal problems. Plaintiffs supervisor indicated that it was the only way for the Call Center to authorize a part time shift. Plaintiff asked Dr. Ezaz how she could determine nothing was wrong with plaintiff when she had not examined plaintiff or seen her X-rays. Dr. Ezaz, all of the sudden, remembered that she had seen plaintiffs X-rays, she said, "oh yes, I remember now, I have seen your X-rays and there is nothing wrong with you," although a moment earlier Ezaz was ordering X-rays and there were no results in plaintiffs chart. Plaintiff said to Dr. Ezaz, "honestly I do not believe you." Ezaz threatened to write plaintiff a shot for insubordination when plaintiff asked if there was another doctor she could see. A shot is a disciplinary action. Ezaz tried to dismiss plaintiff from the office and plaintiff refused to leave until Ezaz agreed to refer

plaintiff to the orthopedic, Ezaz agreed to refer plaintiff even though she insited "nothing is wrong with you." Plaintiff was shocked and shaken by this encounter with Ezaz and Hernandez and felt further traumatized.(See exhibit K Journal entry for 1/04/07)  At 1:45 p.m. plaintiff was taking a nap before having to report to work at 2:30 p.m. Ms. Bernadini came to plaintiffs room and asked plaintiff to show her where the other screw hazards were in the unit.  Plaintiff said to Ms. Bernadini that she had provided a list of them by room number in her BP-9.  Plaintiff did not see why it was necessary for Ms. Bernadini to disturb plaintiffs rest time in order for plaintiff to show her where the screw hazards were.  The first room plaintiff showed her still had the existing hazard and Ms. Bernadini indicated that it was probably left that way because "the step is facing the opposite way."  Plaintiff showed her to E. Valencia's room, who was injured on December 22, 2007 and it still had the screw.  Ms. Bernadini asked plaintiff if would informally resolve the BP-9 and file a Tort.  Plaintiff said that she felt that she was being harassed and that she would not be dropping her administrative remedy and requested a response in writing in a timely manner.  Plaintiff had recently learned that she had to in fact exhaust Administrative Remedies before filing a Tort and anything beyond that, including this lawsuit.  Plaintiff felt that she was being pressured and intimidated by staff in violation of her due process rights to file grievances and her only means of speaking out against the obvious carelessness and willful negligence of the Safety Department.

48.     On January 5, 2007 at 10:00 a.m. plaintiff was awakened by Goldstein, Butts, Blassingame, and Andersen, joined later by Boynton.  Plaintiff

and her roommate were asleep, as they both worked the late shift at
the Call Center. All the above mentioned barged in to the room and
told plaintiff to get up. Plaintiff was questioned about the accident and
told to reenact what had happened. Plaintiff stated that she had
already given a statement in her BP-9 and to Ms. Bernadini and she did
not see why it was necessary for her to reenact a very traumatic experience.
Goldstein was drawing conclusions about what had happened and said that
plaintiff "must have caught the screw coming up from the fall."
Plaintiff said that it was not the way it had happened. Goldstein argued
that he had done many of these kinds of investigations and the way the
scar looked he said with his finger in plaintiffs face, it happened the
way he said it did. Plaintiff explained that she had a gaping hole in
her neck about 3-4 inches in diameter before it was stiched, so she did
not understand how he could conclude what had happened by the scar on
her neck. At this be became irritated. Mr. Blassingame asked plainitff
again to show them how the incident happened, and when plaintiff tried
to explain, she was interrupted and told that what she was saying was untrue.
Ms. Butts yelled at plaintiff to "show them again." At this point plaintiff
was shaking and obviously disturbed at having to relive the trauma and
being verbally attacked by the group of staff crowded in her room. The
pain inthe back of her neck began to throb and she sat on the lower bunk
because she felt dizzy. Plaintiff asked the group to please stop, and
why don't they ask the two witnesses, her roommates, what happened.
Ms. Butts said, "oh, your roommates were there?" Plaintiff indicated,
again, that it was during count, when all inmates must be in their rooms.
Mary Quindo was in the room at the time and they instructed plaintiff to
leave the room and they closed the door and questioned Ms. Quindo.

Plaintiff was left shaken and scared sitting on the same step she sat

on with the blood soaked towel the day of the accident, and cried.

Plaintiff felt that staff was retaliating against her for not dropping

her Administrative Remedy and was now harassing her.  When they left,

Ms. Quindo was considerably shaken and afraid.  She expressed to plaintiff

that she did not want to get in any trouble for telling the truth and

that Goldstein did not like her answers.(See exhibit L Journal entry for

1/5/07)  Monica Lopez. plaintiffs other roommate was approached at work

and harassed by Goldstein, Blassingame and Butts.  Ms. Quindo saw her at

lunch and told plaintiff that Ms. Lopez was upset and scared.  At about

11:00 a.m. the same maintenance man who cut the screw off plaintiffs

bunk was moving around the unit cutting all the screws off the steps,

complaining that someone had made a complaint.  The inmates knew it was

plaintiff and made derogatory comments to her and ostracized her.  At

1:45 p.m. Goldstein opened the door to plaintiffs room, without knocking,

and plaintiff and her roommate were just getting out of the shower and

getting dressed.  Goldstein said "oops, excuse me."  He returned some

moments later and asked plaintiff to take a walk with him.  Plaintiff

walked with him as he looked in the window of each room as they passed.

He indicated that all the screws on the compound had been removed.

Goldstein said that he was there to "informally resolve the Administrative

Remedy and I want you to file a Tort claim and like I said I will help you

with a favorable report and by the way our witnesses said that you were

standing at the locker for a few minutes before you fell."  Plainitff

reinterrated that she had  just climbed down for count and became dizzy

and fell.  Goldstein said "if you had died, you would really have a case,

or your family would."  He said "we are not trying to make you wrong in

**(22)**

this."  Plaintiff said to him that it did not feel that way and that she felt that they were harassing her and made several attempts to make it her fault.  He said, "I am just trying to help you, I got Dr. Ezaz to refer you to the orthopedic specialist. I did that."  Even though when plaintiff saw Ezaz she had no intention of referring her and plainitff had to all but insist before she would agree and she actually never did refer plaintiff until plainitff submitted another BP-9 in April.  He indicated that he had just found out about Ophelia Johnson's injury, even though it was documented in the BP-9 filed by the plaintiff weeks prior and plaintiff informed him that another inmate, Elvia Valencia was injured.  When asked for a copy of the accident report made to Safety, Goldstein said that they had a copy that plaintiff had signed.  Plaintiff to date has not seen or received any report related to this incident although several requests have been made for this document.  Goldstein asked plaintiff againif she was going to "let this incident go" and when plaintiff said that she would not make any agreements with him, he became belligerent and said that it did not matter because he was going to "deny your BP-9 since I am the one who is going to respond to it."  The whole situation was extremely disturbing and traumatic for plaintiff.(See exhibit M Journal entry for 1/5/07) Plaintiffs BP-9 was denied.

49.    On January 6, 2007 plaintiff went to dinner and saw Ms. Lopez working in the kitchen.  SHe told plaintiff that Goldstein, Butts and Blassingame came to see her at work and that they "scared the heck out of her" and that she "thought she was in trouble."  She said they asked her about what had happened and she "told them the truth."  She said they asked her to write a statement and she told them she had already written a statement for plaintiffs BP-9.  She said they "tried to make her say things,

but that she, "just told them the truth of what I saw." (See exhibit N
Journal entry for 1/6/07)  The constant harassment and badgering from
Goldstein and the other staff members, was adding to the trauma and
causing plaintiff undue suffering.  Plaintiff had not broken any rules
and in fact was a model inmate, yet was being treated as if she had
committed a rule infraction or had hurt someone.  Plaintiff has witnessed
inmates who beat other inmates up being treated with more dignity.  Plaintiff
was having nightmares of Ezaz yelling at her and of falling off the top
bunk.  Plaintiff's room had been shaken down almost everyday, disturbing
her roommates and making things tense in the room. Normally an officer
will shake down about five rooms per unit in a shift.  There are about
56 rooms per unit, so it was not normal for one room to be shaken down
everyday.

50.    Plaintiff continued to have the same problems with her neck and the
pain did not subside but increased.  Several more attempts to see Ezaz
again failed.  Discouraged and tired of arguing with Health Service staff,
plaintiff stopped trying to see or get medical attention even though she
was still in extreme pain.

51.    Plaintiff requested a room move from Ms. Andersen because she was
still on the top bunk and because the room constantly reminded her of the
accident.  Andersen refused plaintiff a bottom bunk, even though plaintiff's
roommate wanted to exchange beds with her.  Andersen yelled at plaintiff
when she asked if she wold be moved, saying, "Has it happened yet?" and
"you will be the first to know when you get moved won't you?"  When
plaintiff asked Andersen why she had not received answers to her two BP-9's,
Andersen yelled at her, "I told you, I have nothing to do with that, so
stop asking me about it, now get out of my office."

52.    Plaintiff went to sick call again on January 8, 2007 because she could not handle the pain she was experiencing.  Ms. Rich did not speak to plaintiff to ask why she was there, nor did she read plaintiff's sick call slip.  She said, "the earliest Ms. Hernandez can see you is on Friday."  When plainitff tried to describe to her the level of pain she was feeling, Ms. Rich told her to go to work and forget about it. She refused plaintiff an idle and told her that maybe work would make her feel better and the called "next."  Plaintiff s supervisor took her off the phone and plaintiff sat in the breakroom for the rest of the night because she was feeling dizzy and having shooting pains in the back if her neck and the bottom of her skull.  Plaintiffs pain was and has been a constant source of suffering with very little reprieve. Plaintiff. before the incident, was an active and vital young women, health conscious and physically fit.  Plaintiff ran 5 miles a day and practiced yoga and meditation for over 10 years and is a certified yoga instructor with 500 hours of practical education. Plaintiff had been unable to do yoga or run and gained alot of weight from the lack of activity, at one point she was over 25 pounds overweight.

53.    Between January 5, 2006 and january 20, 2007 plaintiffs room was "shaken down" approximately 8 times, each time plaintiffs legal papers were rifled through and she was left with a mess to clean up.  At one point one of the officers, Mr. Wheeler, apologized to plaintiff saying that he "had to do it."  Plaintiff mailed all her legal papers and copies of her journal to her sister.  Plaintiffs family was very concerned about  plaintiff health and the way she was being harassed.  Plaintiffs mother called the prison and was assured that plaintiff was receiving adequate health care and that she was safe.

54.     On January 11, 2007 plaintiff finally received a receipt for the
BP-9 regarding Safety.  It stated that it was not received until December
26, 2007.  Plaintiff turned in both BP-9's on December 21, 2007.  Mr. Blake
said he did not see a receipt for the BP-9 regarding Medical, but that
he knew that he had submitted the form.  Plaintiff never received a
response to the medical BP-9, except the passive retaliation from Health
Services staff, and because no number was issued at the BP-9 level,
the appeals were all subsequently denied.  The receipt indicated that a
response was due on January 15, 2007.

55.     On January 12, 2007 plaintiff returned to Health Services for her
appointment with Ms. Hernandez, who again, told plainitff to come back on
Monday and see her at sick call.  She again, refused to listen to plaintiff
and walked away, ignoring her completely.  Plaintiff saved the sick call
slip this time, the one they give with the appointment date.  It is
the only one she has in her possession because Health Services staff took
the copy everytime they issued an appointment and then take the appointment
slip when inmate report to the appointment, so that it is difficult to
keep a physical record of visits.

56.     On January 16, 2007 plaintiff still had not received any response
to her Administrative Remedies  According to policy the reponse was due
on the day indicated on the receipt, or the claim can be considered
denied.  Officer Fernandez worked in the unit that day and plainitff asked
him if she could see what day he entered in the log book the incident
when she sustained the laceration to her scalp.  He looked in the log
and said it was October 16, 2006 and he stated in his entry "Ms. Santiago
came to see me bleeding from a wound to her head that she says she got
from the locker," plainitff reminded him that she said she was "bending
down in front of the locker and hit her head on a nail sticking out of the

(26)

step," Officer Fernandez replied, "oh, yeah" and the asked plaintiff what
had happened to her neck. Plaintiff received a cop out she sent to the
Warden Clark asking her about the 2 BP-9's and why she did not receive
a reponse. The cop out said that there was "no record of them being
submitted." Plainitff returned to sick call as directed by Ms. Hernandez
at her prior appointment. When she got to Health Services there was a
sign on the door, "all appoinment cancelled," it felt as if Ms. Hernandez
was playing games with plaintiff, since she told her to come this day.
It had been more than a month since Goldstein said he "got Ezaz to agree
to refer you to the orthopedic specialist" and still no appointment.
Plainitffs friend sees the orthopedic when he comes once a month and
told plaintiff that he had already been there for January.

57.    On January 17, 2007 plaintiff saw Ms. Bernadini at Unicor Call
Center and she asked why she had not received any response to the 2 BP-9's,
since the reponse was due on January 15, 2007. Ms Bernadini said, "you
submitted two?" She said she didn't know why plaintiff had not received
a response, even though she wa  the one who investigated  them both.
Bernadini said she would look in to it.  Plainitff returned to the unit
and requested 2 BP-10's from Mr. Blake.  Plaintiffs room was shaken down
again and it was a mess.

58. On January 18, 2007  plaintiff finally received a response to her
BP-9 regarding Safety, there was no response to the BP-9 regarding
medical, although the BP-9 for medical was returned in the same envelope
and was referred to in the Wardens response.  Policy states that a seperate
grievance must be filed for each issue or it will be denied and returned
to inmate.  There is no excuse for the grievance having no response,
besides the passive retaliation of the Health Services staff in not
treating plaintiff. (See exhibit O Journal entry for 1/18/07)

59.    On January 22, 2007 Elvia Valencia approached plaintiff at work. She said Mr. Goldstein went to see her about her BP-9. He said to her the same things he said to plaintiff, including that he had "just found out about your injury," even though plaintiff spoke to him about it in the unit . He asked her to informally resolve it with im and he would "help her with the Tort claim." She said he scared her because he was "getting in her face and talking in a heated way." He also told her that her BP-9 would be denied. She said she came to speak with plaintiff because she knew that plaintiff had filed a BP-9 also. (See exhibit P Journal entry 1/22)

60.    On January 28, 2007 there was another shake down on plaintiffs room. Plaintiff was a model inmate with no disciplinary actions. This was not normal operations according to the other inmates, and no one else in the unit had their room shaken down so often.

61.    On January 30, 2007 plaintiff saw Dr. Ezaz at mainline and asked her if she had referred plaintiff to the orthopedic doctor. Ezaz asked plaintiff her name and when plaintiff told her she said, "oh you. I don't know about that. I told Hernandez to do it." Plaintiff said, "so Hernandez referred me then?" and Ezaz replied, "I don't know." (See exhibit Q Journal entry for 1/30/07)

62.    On February 1 and 2, 2007 plaintiffs room was shaken down again and trashed, papers rifled through and locker and room a mess. (See exhibit R Journal entry for 2/1-2/2/07) Plaintiff saw Mr. Blassingame doing inspection in a room down the hall (it is prudent to note here that both Goldstein and Blassingame do weekly inspections of all the units, and the results are posted on the units bulletin board for the inmates to see because the results determine the dinner rotation for the week. Hence, the fact that they had to have seen and known the makeshift steps and screws sticking out of the step existed because they inspected the rooms every week.) Plaintiff took Mr. Blassingame and showed him a friends bunk which was unstable and wobbly. It took over 3 weeks for the bed to be fixed and plaintiffs frien actuallt fell off the bed trying to climb

up to the top bunk using the window sill because the was not step or

ladder affixed to the bunk.

63.    On February 3, 2007 plaintiff awakened in excruciating pain

and went to  the unit officer and asked him to call the duty PA (physician

assistant).  He called and she asked him what was going on.  She told

him to "tell her to put warm compresses on her neck," and to take

ibuprophen."   She said to go to sick call on Monday, this was Saturday.

64.    On February 5, 2007 plaintiff chacked with her friend L.Dubois

and asked her if her bed was fixed yet (See exhibit R) She said it was not.

65.    On February 6, 2007 plainitff went to sick call again and received

an appointment for 2/15/07.  SHe was refused naproxen.  Plaintiff wrote

several cop outs to Hernandez asking whether she had been referred to see

the orthopedic, but received only one response stating that she did refer

plaintiff to see Dr. Jupina in January.  There was no referral made.

Plaintiff also sent cop outs to Ezaz asking to see her for treatment,

only one was returned. (See exhibit S ).

66.    On February 8, 2007 plaintiffs room was shaken down again.

67.    On February 13, plaintiff went to sick call because of extreme

pain in the back of her neck and skull.  Plaintiff was told there was nothing

anyone could do for her and to come to her appointment on the 15th.

68.    On February 14, 2007 plaintiff saw Ezaz at mainline and asked

her if she had been referred to the orthopedic doctor.  Ezaz became

agitated and told plaintiff to "talk to Hernandez."  Plaintiff informed

Ezaz that she was not getting any response from Hernandez and that she

kept cancelling plaintiffs appointments and also that no one was listening

to her at sick call.  Ezaz said, "I don't know what to tell you then."

Plaintiff tried to tell Ezaz the difficulty she was having with the pain

in her neck, Ezaz told her to go to sick call.  Plaintiff tried yet again that Hernandez had cancelled her last appoinment and never rescheduled. Ezaz told plainitff to keep appointment with Hernandez for the following day.

69.    On February 15, 2007 plaintiff showed up at Health Services for her scheduled appoinment and another PA told her that Ms. Hernandez was not there.  No explanation.

70.    On February 26, 2007 plaintiff was approached by inmate Becky Hunter who said she was talking with Ms. Butts and that Butts had said to her that she "knew that your friend was not doing yoga at the time of her accident" and that "her staff had lied" to Butts.  She also told Ms. Hunter that she knew the accident was not plaintiff fault. (See exhibit T Journal entry for 2/26/07

71.    On February 27, 2007 plaintiff went to sick call with a fever but sick call was cancelled, no explanation, no reschedule.  The next day plaintiff attempted to go to sick call again and it was cancelled.  Plaintiff asked unit officer to call for PA because she felt her fever was getting worse. The PA told the officer "unless she is dying, it is not an emergency," and she refused to see plaintiff.  Plaintiff was forced to go to work sick with fever.  An inmate, clerk at the Call Center took plaintiff off the phone and plaintiff laid with her head on the table for the evening.

72.    On Ma ch 1, 2007 plaintiff was moved from the room where the incident occurred to another room upstairs to another top bunk.  Although plaintiff clearly expressed to Andersen that she was still having dizzy spells and still recovering from her fall.  Andersen said that unless she had a memo from medical she would remain on the top bunk.  Andersen could have put plaintiff on a lower bunk but simply refused.  There are many other inmates that had requested a lower bunk and received it from her, even people who were new to the facility.  Lower bunk were and are not just reserved for medical reasons.  The bunk beds are up on top of wood blocks which make them

higher and more difficult to climb up and down from. The drop from the makeshift step to the floor was well over the length of the average females legs. Plaintiff feared to fall every time she had to climb up and down from the top of the bunk. On this day also plaintiffs room was shaken down, even though she had just moved in, and being Jewish, plaintiff was observing a proscribed fast. When she returned to her room from Jewish services, Mr. Wheeler was shaking her room down and he removed all of plaintiffs food, which she was authorized to have and which the officers were all issued memos about. Plaintiff asked for her food back to break her fast and Wheeler refused, syaing that he could not do that. Then when plaintiff returned to her room, Wheeler called her back to the officers station and offered her her food back in a garbage bag. (See exhibit U Journal entry for 3/01/07) It is prudent here to remark that plaintiff recently filed a BP-9 on an officer in Food Services, Miller, regarding staff misconduct toward plaintiff because he had cursed her out and picked food up off the floor and placed it on plaintiffs Kosher tray while making anti-semetic comments.

73.    On March 2, 2007 plaintiff attempted  to go to sick call because she was still running a low grade fever and it was cancelled again. When plaintiff asked the Lieutenant when or if it would be scheduled for later that day he said "we will let you know." It was never rescheduled.

74.    On MArch 7, 2007 plaintiff went to sick call again to see about getting pain medication. She was refused even though Ezaz told her that she must "take pain medication religiously." Plaintiff was also refused another appoinment with Hernandez even though Hernandez never rescheduled the appoinments she had missed.

75.    On March 12, 2007 plaintiff went tomainline to speak to Ezaz. Ezaz said she knew nothing about whether plaintiff had been referred to the orthopedic and to talk to Hernandez. Plaintiff informed her that she went to sick call as instructed by her, to get Naproxen and another appoinment

to see Hernandez and was refused both.  Ezaz said there was nothing she could do.  Plainitff informed her that she had received a cop out from Hernandez saying that she had referred plainti f to see the orthopedic in January.  Plaintiff was never placed on the callout (list of appointments for inmates) snd that she still had not seen the orthopedic doctor.

76.    Since December 6, 2006 plaintiff requested over 6 times for copies of her medical records and received no response. (See BP-9 for Overcrowding)

77.    Plaintiffs BP-11 to the Central Office was returned two seperate times for "no such address" plaintiff checked and rechecked the address as marked on her envelope and found it to be the correct address.  The third time it was mailed it was received at the same address it was returned twice marked as "no such address."  Mail goes in and out through the Dublin mail room.

78.    Plainttiff feels to address the issue of overcrowding at th Dublin FCI.  The facility is more than double capacitated.  People are stacked 3 and 4 to a room originally designed tohouse one person, two maximum.  The stacking of the bunk beds whose original design was as a single bed to be placed on the floor, have been welded together and stacked extremely high,on wood blocks, with a makeshift step not part of the original design of the bed attached to the bar with screws left extended into the already cramped living space.  The rooms are approximately 7x13 feet and contain 3 or 4 beds, a sink, a toilet and three lockers.  Two of the lockers are stacked on top of each other unsafely because they are not bolted together and therefore pose a safety hazard should one fall over.  The ventilation in the rocms is inadequate and the air quality poor.  Most of the time there is no air coming through the vent at all.  The windows have been welded shut and at night it is difficult to breath.  Plaintiff asserts that because of overcrowding, inmates are unable to get proper medical care, routine dentistry.  Plaintiff has demonstrated this in the

facts set forth in this complaint in her battle to obtain treatment for
an injury caused by the negligence and deliberate indifference of
Bureau of Prisons staff.  There is only one officer assigned to two units
in which there are housed approximately 380 inmates.  The lobbies are
closed most of the day, forcing inmates to remain in their rooms until
after the 3:00 p.m. count.  The buildings are in disrepair, for example,
of the 8 showers available in one unit that 175 women share, 4 of them
are in working order.  The rest are  continuously closed for repair.
There is mold growing under the drywall and fills the air with mold spores
which are toxic to breathe.  There are no water filters, forcing inmates
to drink unpurified water from the tap.  Recently a closed movement was
implemented which significantly decreased the space inamtes could use
on the compound.  This for"security reasons" in a low security facility.
Plaintiff asserts that it is because of lack of staff at the facility.
Yet the women are forced to spend all outside yard time in the recreation barn
and yard, which only has two officers at a time for 600 inmates or more.
Since the compound was closed there have been more instances of violence,
due to having to be confined in cramp quarters all the time.  The noise
level is outrageous in the units and at time deafening.  The air is poor
and inadequate for the numbers.  The lighting is negligently and deliberately
neglected.  At last count plaintiff counted 35 out of 50 lights burned out
in the A Unit and only one light working in the B Unit.  It has been this
way for the entire 3 years thatplaintiff has been incarcerated at Dublin
FCI.  Unit Officers are informed, they inform Unit Manager, Peggy Boynton
and nothing changes.  At night the stairways are so dark that it is so
difficult to see that inmates fall down all the time.  All unit team staff
work at least one night per week and so must be aware of how dark it is
in the lobbies and upstairs halls.  The rooms have one florescent fixture
that is situated behind a wall and inmates are unable to see properly in
their beds, which is the only place for them to be since  there is no floor

space.  There is barely room for all 3 or 4 inmates to stand for count. There are over 1200 inmates on the Dublin FCI compound which originally had a maximum of 753 inmates.  There is precedent case law establishing a minimum of 55 square feet of living space for inmates.  Hoptowit v. Ray F2nd 1237 (9th cir) and recent California Supreme court rulings on  overcrowding.  Dublin FCI officials know that the facility is beyond capacity and still maintain overcrowded conditions to the detriment of its inmates.

79.    On April 6, 2007 plaintiff submitted another BP-9 regarding Health Services and overcrowding because the prior BP-9 filed was completely ignored and was subsequently denied at all levels of appeal. (See BP-9 regarding overcrowding)

80.    Plaintiffs BP-9 regarding Medical was returned for failure to file a BP-9.  Although plaintiff did file a BP-9 and it was completely ignored by Dublin FCI staff and therefore never given a reference number but was appealed appropriately for lack of response, which is deemed as a denial, as per policy.

81.    On April 20, 2007 plaintiff was placed on the call out for and appointment at Health Services Chronic Health.

82.    On April 23, 2007 plaintiff reported for her appointment with Dr.Ezaz.  The entire appointment took three minutes.  Dr. Ezaz did not listen to anything plaintiff tried to tell her about the problems she was having with her neck.  Ezaz told plaintiff that the orthopedic doctor had not been there.  Plaintiff informed Ezaz that she knew that he had been there because her friend had seen him in March and another inmate reported that she had seen him in February, and that in fact he comes to the compound once a month.  Ezaz refused plaintiff any pain

**(34)**

medication and told plaintiff to purchase ibuprofen from commissary.
Ezaz said if plaintiff showed her three months of commissary receipts
showing purchase of ibuprofen, then she would give plaintiff Naproxen.
Ezaz said the xrays showed mild degeneration in the C4 and C5.  Plaintiff
had never had any problems with her neck before this incident.  She  said
there was nothing she could do and to stop making problems with BP-9's.
She said she referred plaintiff to see Dr. Jupina (orthopedic).  Ezaz
had told plaintiff on previous occasions that the xrays she had taken
showed that there was nothing wrong with her. (See exhibit V Journal entry
for 4/23/07.

83.    On April 24, 2007 plaintiff finally received copies of her medical
records.  Plaintiff immediately noticed several discrepancies, including
Ezaz directly misquoting plaintiffs statements at her appointment the day
before on 4/23/07.  It took plaintiff five months, 6 cop outs and a BP-9
to get copies of her medical records, an appointment with Ezaz, and a
referral to the orthopedic.  Plaintiff noticed one major discrepancy
regarding her chart, where it show that she was seen on October 19, 2006
and the actual charting and appointment took place on December 4, 2006
as it is signed and dated by Dr. Ezaz on that day.(See exhibit W Medical
Records SOAP chart entry)  The chart indicates that plaintiff complained
of neck pain from a fall she had where she hit her head.  This conversation
was about the accident on 12/03/06 and yet the chart indicates that there
was an injury in January.  Plaintiff has been incarcerated since November
13, 2005 and has had no other accidents or medical problems.  In fact
plaintiff has never in her life had to take any pain medication.  There
are no other references to any injury anywhere else in her medical records
from the Federal Detention Center in Honolulu, where she was housed prior

to coming to Dublin FCI.  This entry of the SOAP chart is in question and suspect to falsification of documents.

84.    On May 1, 2007 plaintiff was seen by the orthopedic, Dr. Jupina, who spent about four minutes speaking with plaintiff and said he could do nothing for her.  He said she "suffered a substantial trauma" and that plaintiff "should have worn a neck brace to stabilize the vertebrae." He said he thought plaintiff "still had muscle damage" and that she "may never be back to normal" and that it is "likely you have permanent damage."  He prescribed Naproxen because he said that was all the Bureau of Prisons would allow and said he was "sorry that he couldn't do anything, but you require physical therapy." See exhibit X Journal entry for 5/1/07)

85.    Plaintiff is permanently damaged from the carelessness and negligence of Bureau of Prison staff in providing a safe living enviroment and for Health Services refusing plaintiffs neck brace and overriding of another doctors prescription.  The deliberate indifference to plaintiffs safety and medical needs after the accident to aid in proper healing of the muscles and the C-spine is glaring and begs for relief.  Plaintiff suffers from pain and discomfort in her neck everyday since her accident.  Health Services filled Jupinas prescription one time and then discontinued. Plaintiff had to leave the facility to return to Honolulu for court and was given pain medication immediately upon reporting to staff there of the accident and subsequent trauma she suffered on 12/3/06, a much different response than the Health Service staff at Dublin FCI's deliberate indifference to plaintiff serious medical issue caused by the willful negligens and deliberate indifference of the Dublin FCI Safety department in maintaining safe housing quarters for its inmates.

86.    Plaintiff has not received any medical services from Dublin FCI

medical staff since Jupinas visit barring a work related laceration when she cut her hard chopping vegetables on July 8,2008.

87.    Plaintiff has incurred mental and emotional injury from the defendants treatment of plaintiff after the accident such as harassment, retaliation, threats and general intimidation of plaintiff.  Dublin FCI staff both tried to circumvent plaintiff's due process with respect to her BP-9's or blatantly ignored then retaliated against plaintiff for filing grievances.  Plaintiff still has nightmares of falling off the top bunk and breaking her neck or of cutting her jugular vein and bleeding to death and she awakens crying very often from these nightmares.   This was literally one of the most traumatic experiences of plaintiffs life.

88.    Upon receiving hermedical records from Valley Medical and reading the discharge orders of the attending physician, one of the orders was to return to the hospital immediately if patient experienced any of the following symptons: Numbness (loss of feeling) or tingling in arms or legs; Weakness in arms or legs; A feeling that neck is unstable; Loss of bladder control; Severe or increasing pain.  Plaintiff complained of several of these symptons over the several months after her accident and still experiences the same symptons.  No one at Dublin FCI has taken her concerns or complaints seriously and have blatantly ignored and refused plaintiff treatment, thereby compromising plaintiffs health and welfare.(See exhibit Y, Discharge orders from Valley Medical)

89.    Plaintiff was moved to the Federal Detention center in Honolulu for a month for a resentencing hearing.  When plaintiff returned from that hearing to the Dublin FCI in February of2008, ladders had replaced all of the makeshift steps throughout the compound, showing the Bureau of Prisons admission and correction of the hazard.  It had been eighteen

months since plaintiffs accident and happened after plaintiff filed
her Tort claim with the Western Regional office, which had until March
2, 2008 to respond to plaintiffs Tort claim and they did not.  The
ladders are a "bandaid" to the problem and pose hazards of their own.
They are still, not a part of the original design of the bed and are
not adequate nor any safer than the steps were.  Many inmates have complained
about them and are afraid to use them at all because they have no
adequate hand grips.  Inmates have already sustained injuries trying
to use these ladders.  One of the major problems is the lack of space
between the beds (less than 18 inches) and because the women are afraid
to use the ladders, they climb up and down using the lockers and the
bars which are welded to the bed.  There is a significant lack of floor
space in which to move around the cells, let alone share with 3-4 other
people.

## V. EXHAUSTION OF LEGAL REMEDIES

90.      Plaintiff, Jeanine Santiago, used the prisoner grievance procedure
available at Dublin FCI to address the concerns and problems brought
forth in this action.  On December 18, 2006, plaintiff submitted a
BP-8.5 for informal resolution regarding safety conditions and received
no response.  On December 21, 2006 plainitff filed a formal grievance
in which she presented facts relating to this complaint.  On January
18, 2007 plaintiff received a response stating that the grievance had
been denied (See response in BP-9 regarding Safety).  On February 2,
2007 plaintiff appealed to the Western Regional office.  On February 16,
2007 plaintiffs appeal was denied (See response in BP-10 regarding safety)

(38)

On March 29, 2007 plaintiff appealed to the Central Office.  On May 25, 2007 Central office denied plaintiffs appeal (See response to BP-11) Thereby exhausting Adminstrative remedies.

91.    Plaintiff, Jeanine Santiago, used the prisoner grievance procedure at Dublin FCI to address the concerns and problems brought forth in this action.  On December 18, 2006 plaintiff submitted a BP-8.5 for informal resolution regarding Medical care and received no response. On December 21, 2006 plaintiff filed a formal grievance in which she presented the facts relating to this complaint.  Plaintiff received no response ar acknowledgement (receipt) for this BP-9, except for a reference to one of the issue addressed in the response to the BP-9 regarding Safety (See BP-9 response regarding Safety) and that it was returned with the BP-9 regarding Safety in the same envelope.  Plaintiff proceeded to file an appeal in compliance with policy, which states that if no response is received, it can be deemed as a denial of the grievance.  Plaintiff appealed to the Western Regional office with a clear explanation that no response was received at the Administrative level.  Plaintiff received no response from the Western Regional office and proceeded to appeal under 28 CFR 542.18, under the assumption of denial at the level of the Western Regional office.  Plaintiff  appealed to the Central office and explained  in her appeal that she had received no response at the Administrative  and Western Regional levels.  On March 27, 2007 plaintiff received a rejection notice stating that BP-9 must first be filed  the Administrative level(See rejection notice in BP-11 regarding Medical)  Plaintiff resubmitted the appeal under the premise that she did  in fact submit Administrative remedy to Dublin FCI's Warden, Sheila Clark, who responded to it in another BP-9's response.

This BP-9 was also investigated by Dublin FCI staff member Ms. Bernadini. Plaintiff was at this point issued an identification number Remedy ID#44127-A1.  On May 8th, 2007 Central office, again, rejected plaintiffs grievance for the same reason given even though plaintiff again, submitted copies of all grievances and also a cover letter explaining that she did in fact submit the Administrative remedy to Warden Clark and that she was in compliance with policy.

92.      On March 30, 2007 plaintiff, Jeanine Santiago, used the prisoner grievance system at Dublin FCI to address the concerns and problems brought forth in this action.  On March 30, 2007 plaintiff submitted aBP-8.5 for informal resolution regarding overcrowding and received no response. On April 6, 2007 plaintiff filed a formal grievance in which she presented the facts relating to this complaint.  Plaintiffs grievance was denied at the Administrative level.

93.      On July 31, 2007 plaintiff submitted a Standard form 95, Claim for damage, injury or death.  Plaintiffs claim was filed with the Western Regional office and plaintiff received confirmation from that office of the date filed as August 2, 2007 and a claim number.  The agency had six months to respond to plaintiffs claim.  Plaintiff received no response. In accordance with 28 U.S.C. §2671 plaintiff had six months from the date from which Western region had to respond to claim, which was March 2, 2007, to file a lawsuit.  Therefore this lawsuit is filed timely.

94.      Plaintiff exhausted all Administrative Remedies available.


## VI. LEGAL CLAIMS

95.      Plaintiff realleges and incorporates by reference paragraphs 1-94.

(40)

96.    Defendants knowledge of and deliberate indifference to the unsafe conditions at the Dublin FCI, compromised the personal safety and directly caused plaintiff's two seperate injuries, intentionally violating plaintiff, Jeanine Santiago's rights and constituting cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

97.    Defendants deliberate indifference for the safety of Federal inmates violated plaintiff, Jeanine Santiago's rights and constituted cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

98.    Defendants deliberate indifference for the medical needs of injured plaintiff, Jeanine Santiago, violated plaintiff's rights and constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

99.    Defendants intentional act of providing unsafe, overcrowded conditions (ie. 4 persons bunked in 7x13 cells; housing inmates with infectious disease such as tuberculosis and MRSA Methacillin resistant staph aureus in general population; inadequate lighting in the cells; bunk beds rigged to accomodate excessive population and not of original design; housing mentally ill inmates in general population; inadequate ventilation in cells exposing inmates to carbon dioxide poisoning because of too many people in one space sharing air; inadequate medical care; poor sanitation; inadequate lighting in the units; dangerous recreation areas, ungraded running track and unsupervised activities; unsafe staff to inmate ratio) violated plaintiff, Jeanine Santiago's rights and constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

100.    Defendants abused their authority by threatening and attempting to coerce and divert plaintiff from excercisng her rights to pursue access to the courts through Administrative Remedy and Civil action

which violated plaintiff, Jeanine Santiago's rights and constituted due process of law violation under the Fifth and Fourteenth Amendments to the United States Constitution.

101.    Defendants retalition against plaintiff for excercising her right to report conditions under 42 UCS 1997 violated plaintiff, Jeanine Santiago's rights and constituted a freedom of speech violation under the First Amendment of the United States Constitution.

102.    Defendant, Bureau of Prisons Staff's failure to adhere to Bureau of Prisons policy, Code of Federal Regulations and Dublin FCI's program Statement with regard to Administrative remedy procedure violated plaintiff, Jeanine Santiago's rights and constituted due process of law violations under the Fifth and Fourteenth Amendments to the United States Constitution.

103.    Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein.  Plaintiff has been and will continue to be irreparably injured by the conduct of the Defendants unless this honorable court grants the declaratory and injunctive relief which plaintiff seeks.


**Wherefore,**  Plaintiff respectfully prays that this court enter judgement granting plaintiff:

104.    A declaration that the acts and omissions described herein violated plaintiff's rights under the Constitution and the Laws of the United States.

105.    A preliminary and permanent injunction ordering defendants, Federal Bureau of Prisons et al, and Dublin FCI to reduce its inmate population to safe and legal capacity and to remove all existing unsafe bunk bed that are not of original design.  A direct conflict of interest exists between the Occupational Health and Safety Administration(OSHA) and the Federal Bureau of Prisons, whereas OSHA delegates the regulatory

duties and responsibilities of managing safe prisons to the Safety Departments at the Bureau of Prisons. Accordingly, in the instant case the complacent carelessness, negligence and coercion demonstrated by the Safety Department at the Dublin FCI calls for an immediate reevaluation of the "rubber stamp" relationship that exists between the Federal Bureau of Prisons and the Occupational Health and Safety Administration. Therefore, plaintiff requests an outside investigation by "unassociated" OHSA officials.

106.    Binding arbitration or a mitigating settlement negotiation.

107.    Compensatory damages in the amount of $1,500,000.00 against each defendant, jointly and severally.

108.    Punitive damages in the amount of $1,000,000.00 against each defendant.

109.    A jury trial.

110.    Plaintiff's costs in this suit.

111.    Any additional relief this honorable court deems just, proper and equitable.

DATED: _____

Respectfully submitted

Jeanine Santiago
92639-022
5701 8th Street
Dublin, CA. 94568


**VERIFICATION**

I have read the foregoing complaint and hereby verify that the matters set alleged therein are true, except to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Dublin, California


Jeanine Santiago

# CERTIFICATE OF SERVICE

I certify that the following document __CIVIL COMPLAINT AGAINST__

FEDERAL BUREAU OF PRISONS _____, was placed in the institution mailbox

(first-class postage, prepaid). Said document was sent to the following

individual on the date listed below. Pursuant to Houston v Lack, 487 U.S.

266 (1988). Under Title 28 U.S.C. §1746. "Pro se litigant's pleadings are

filed at the moment of delivery to prison authorities."

AUGUST 1, 2008
_____
DATE

_____
SIGNATURE OF PERSON MAILING

United States Attorney Office

U.S. District Court
CLERKS OFFICE
450 Golden Gate Ave., 16 Floor
San Francisco, CA. 94102

Santiago Jeenine

~~[redacted]~~022

~~Federal~~ Correctional Institution

**Official Business**
**Penalty for Private Use, $300**

5101 8th St
Dublin CA 94568

RECEIVED

AUG 6 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

US D

Cler

450

San



PRIORITY® MAIL
UNITED STATES POSTAL SERVICE

Visit us at usps.com

Label 107R, January 2008



U.S. POSTAGE
PAID
SAN RAMON.CA
94583
AUG 04 '08
AMOUNT
**$0.00**

UNITED STATES
POSTAL SERVICE
0000    94102    00052809-99

LEGAL

MAIL

STRICT COURT

OFFICE

HEN Gate Ave, 16ᵗʰ Floor

ANCISCO, CA, 94102